W. M. JACKSON, Superintendent of
Banks of the State of Georgia,
Plaintiff-Appellee,

v.

The FIRST NATIONAL BANK OF
GAINESVILLE et al., Plaintiffs-
Intervenors-Appellees.

The FIRST NATIONAL BANK OF COR-
NELIA, CORNELIA, GEORGIA,
Defendant-Appellant,

v.

William B. CAMP, Comptroller of the
Currency of the United States,
Defendant-Intervenor.

No. 29142.

United States Court of Appeals,
Fifth Circuit.

Sept. 9, 1970.

Joseph A. Griggs, Cornelia, Ga., E. Barrett Prettyman, Jr., Washington, D. C., for appellant.

William B. Gunter, Gainesville, Ga., Arthur K. Bolton, Atty. Gen., Harold N. Hill, Jr. Executive Asst. Atty. Gen., Robert J. Castellani, Atlanta, Ga., for the Superintendent of Banks of the State of Georgia.

Before JOHN R. BROWN, Chief Judge, GOLDBERG and CLARK, Circuit Judges.

CLARK, Circuit Judge:

The First National Bank of Cornelia, Georgia (Bank) appeals from the denial by the District Court of its request for a declaratory judgment that it was not engaged in illegal branch banking through the use of an armored car service for its customers. A prior final adjudication of the district court established that this Bank's ownership and management of this same type of armored car service was a violation of Georgia branch banking laws. While the incorporation of a one-bank holding company and the paper transfer of the armored car service to a counterpart subsidiary corporation of that holding company might terminate the violation in strict form, it changes not a whit of the substance. Since the whole scheme of maintaining competitive equality between the national and State banking systems looks to substance not form, we affirm.

The facts are stated most favorably to the appellee and full accord is given to the findings of fact and conclusions of

law made by the district court in an earlier phase of this case in an order dated October 22, 1968, the appeal from which was voluntarily dismissed.[1] The order is now final and is the law of this case.

Approximately three years ago the Bank purchased three armored cars, which it illegally utilized as branch banks.[2] After the October, 1968 order of the trial court halted this activity, the Bank sought to do indirectly that which the district court had prohibited it from doing directly. The Bank chartered two Delaware corporations, one as a holding company of the bank and the other as a subsidiary of the holding company. The Bank then transferred operation and ownership of the armored car service to the subsidiary corporation, which continued to operate the service exactly as it had been operated before solely on behalf of the bank for the benefit of the bank's customers. The armored car service charged the Bank's customers nothing and had no visible means of financial support. Obviously it lived in the land where profit is the lifeblood of business by drawing fiscal sustenance from the Bank, using the holding company as its artery.

 The Bank instituted this action seeking a judgment declaring that the operation of the armored car service by the holding company did not constitute branch banking. The district court held:

"The court is of the opinion that the activities presently conducted clearly constitute 'branch banking' within the meaning of the *Dickinson* decision. [*See infra.*] As such, they are prohibited by 12 U.S.C. § 36(f) and Georgia Code § 13–204.1 except upon bank premises as defined by the state statute. The fact that they are now performed by a sister subsidiary of the Holding Company controlling the Cornelia Bank is of no avail as this contractual arrangement merely accomplishes indirectly what the bank is prohibited from doing directly. Nor is the fact that bank holding companies in Georgia have been permitted to engage in other activities such as real estate, stock investments, life insurance, etc. persuasive. The point is that none of those activities constitute 'branch banking' as now defined, but rather relate to non-banking functions."

We agree. The ownership of the armored cars was never dispositive of the case. Every Georgia bank is forbidden to use armored cars to extend the geographic reach of their banking facility in the form followed here. The transfer of ownership of the armored trucks from the Bank to a holding company did not affect the continued prohibition on the use of such trucks by the Bank to extend its area of banking operations.

In First National Bank in Plant City, Florida v. Dickinson, 396 U.S. 122, 90 S. Ct. 337, 24 L.Ed.2d 312 (1970), the Supreme Court made it quite clear that in determining whether activities by national banks violated the principle of "competitive equality" with State banks that form should not prevail over sub-

---

1. Jackson v. First Nat'l Bank, of Cornelia, 292 F.Supp. 156 (N.D.Ga.1968), appeal dismissed, No. 26938, February 5, 1970 (5th Cir.)

2. Among the conclusions of law of the district court in its October, 1968 order, were these:
 "12. The operation of the above described 'armored truck bank messenger service' by defendant bank pursuant to paragraph 7490 of the Comptroller's Manual for national banks constitutes the operation of a branch bank outside the city limits of Cornelia, Georgia, and as such is illegal under Georgia law. Ga.Code § 13–203.
 "13. In addition, the operation of the above described 'armored truck banking messenger service' by defendant bank pursuant to paragraph 7490 of the Comptroller's Manual for national banks constitutes the carrying on, conducting or doing a banking business through banking facilities other than on the premises of the place of business of defendant bank and as such is illegal under Georgia branch banking law and under the policy it seeks to establish. Ga.Code § 13–204.1." 292 F.Supp. at 161.

stance. In that case, the bank argued that its armored cars which picked up deposits were not engaged in branch banking because the depositors entered into a contract with the bank that the deposits delivered to the armored car would not be deemed received until they were physically delivered into the hands of the teller on the bank's premises. The court answered:

> We need not characterize the contracts as a sham or subterfuge in order to conclude that the conduct of the parties and the nature of their relations bring First National's challenged activities within the federal definition of branch banking. *Here, penetrating the form of the contracts to the underlying substance of the transaction,* we are satisfied that at the time a customer delivers a sum of money either to the armored truck or the stationary receptacle, the bank has, for all purposes contemplated by Congress in § 36(f), received a deposit. The money is given and received for deposit even though the parties have agreed that its technical status as a "deposit" which may be drawn on is to remain inchoate for the brief period of time it is in transit to the chartered bank premises. The intended deposits are delivered and received *as part of a large-scale continuing mode of conducting the banking business designed to bring basic bank services to the customers.*

396 U.S. 137, 90 S.Ct. at 395 (emphasis added).

So too in this case the armored cars were used as "a large-scale continuing mode of conducting the banking business designed to bring basic bank services to the customers." The law of this case is that armored cars may not be operated as branch banks by federally chartered banks, because state banks may not engage in branch banking. Here, as in *Plant City,* we don't need to call a sham a sham. To ignore the substance of the operation of the armored cars in this case and allow rolling branch banks to be provided "on behalf of the bank" through the real or fictional largesse of a parent holding company, would illegally disrupt the competitive equality between federal and state banks in Georgia.

Affirmed.